UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80296-CIV-HURLEY

MICROSOFT CORPORATION,
     plaintiff,

vs.

BIG BOY DISTRIBUTION LLC,
a Florida limited liability company;
STEVEN BLACKBURN;
EDUCATIONAL SOLUTIONS and
TECHNOLOGICAL DEVELOPMENT INC.,
d/b/a EDUCATIONAL SOLUTIONS and EDSOL,
a Jordanian company, and MAHMOUD SHADID,
     defendants.
_____/

MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
LIABILITY [DE # 55], GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON BIG BOY DEFENDANTS' COUNTERCLAIMS [DE # 57] &
DENYING BIG BOY'S CROSS MOTION FOR SUMMARY JUDGMENT [DE# 59]

This is an action for damages and injunctive relief arising out of the defendants' alleged

infringement of plaintiff's copyrights in its software. Plaintiff Microsoft Corporation ("Microsoft")

alleges that defendants Big Boy Distribution LLC and Steven Blackburn (cumulatively "Big Boy")

unlawfully imported into the United States copyrighted Microsoft Student Media software that was

manufactured abroad and intended for schools and other qualified educational users abroad, and

then distributed that software in the United States without approval or authorization from Microsoft.

The case is currently before the court on the following motions:

(1)   Microsoft's motion for partial summary judgment on Big Boys' liability for
      copyright infringement and unauthorized importation of copyrighted works
      [DE# 55];

1

(2)     Microsoft's motion for summary judgment on Big Boys' counterclaims [DE# 57];

(3)     Big Boys' motion for partial summary judgment on first sale defense  [DE# 59].

## I. Factual & Procedural Background

Microsoft Corporation is engaged in the manufacture and distribution of computer software programs, including  Student  Media  software  which is distributed at a discount to qualified educational  users in order to provide students in the United States, in developing countries and worldwide low cost access to the latest software technology and information in furtherance of their educational development.

Microsoft distributes  Student  Media through  three academic licensing programs -- Campus Agreement, School Agreement and Academic Select.  In the United States, an  institution enrolled in one of these academic licensing programs may order Microsoft Student Media software only through  Authorized  Education Resellers ("AERs"), which are specially trained to distribute the product  to qualified educational users.  The academic institutions, students and qualified educational end users  are prohibited from reselling Student Media software because the programs though which it is distributed are designed to provide low cost software to qualified  students and not to the general public.

Microsoft also imposes geographical restrictions on the  distribution of Student Media through international  licensing and distribution programs.  For example, Student Media licensed and distributed  for use in Europe, the Middle East or Africa is not licensed for use in North America.

Big Boy buys and sells computer software on the open market. Microsoft alleges that at a time prior to October, 2006, Big Boy improperly acquired thousands of units of Student Media software intended for distribution abroad and then sold it to non-educational end users in the United States. In support of this charge, Microsoft adduces uncontradicted evidence that Big Boy directly imported into the United States approximately 10,000 units of Microsoft Student Media software from Mahmoud Shadid of Anman, Jordan, on behalf of a third party, eDirect Software ("eDirect"), a Candian company, and eDirect's principal, Jesse Willms. In addition, Big Boy indirectly imported thousands of units of Microsoft Student Medica software through purchase from eDirect, and then redistributed about 9,000 units of that software to resellers and online retailers who are not qualified educational users. Defendant Steven Blackburn admits that he personally participated in the importation and distribution of this Microsoft Student Media software, which was clearly labeled "not for retail distribution" and "not for resale."

Through work order numbers marked on this product which was impounded during prior litigation between Microsoft and eDirect, Microsoft determined that the software imported by Big Boy under this arrangement was manufactured and assembled in Ireland, and was not licensed for distribution or use in the United States.[1]   Further, it determined and now establishes that the

---

[1]

In a prior suit, *Microsoft Corporation vs. eDirectSoftware et al.*, No. CV-06-53-BLG-RFC (D. Mont.), Microsoft and eDirect filed a stipulation agreeing that certain Microsoft Student Media software held by Big Boy Distribution on behalf of eDirect be impounded, and an November 2, 2006 the *eDirect* court entered an order accordingly impounding that software.

In accordance with that order and agreement, in November 2006, Big Boy shipped the software (which it imported into the United States from Jordan on eDirect's behalf) to J.P. Logistics in Las Vegas, Nevada. On December 8, 2006, Microsoft and the defendants in the eDirect suit filed another stipulation and proposed order by which the parties and Big Boy agreed to impound another 3500 units of Microsoft Student Media software in Big Boy Distribution's possession. On December 12, 2006, the eDirect court entered an order impounding that software pursuant to the stipulation,

Microsoft software product which Big Boy admitted to importing and distributing through this arrangement was initially distributed to EdSol or Farah Trading and Contracting Co. in Jordan pursuant to an agreement between Microsoft Ireland Operations Limited, a Microsoft Corporation affiliate, and the Kingdom of Jordan, specifically the Jordanian Ministry of Education. Dr. Khaled Toukan, the Minister of Education and Higher Education for the Kingdom of Jordan, entered into the Jordanian Ministry of Education Agreement on behalf of the Kingdom of Jordan.

Pursuant to the Jordanian Ministry of Education Agreement ("MOE Agreement"), the Jordanian Ministry of Education and its qualified educational users are authorized to use certain Microsoft Student Media software. Further, under the MOE Agreement, the Jordanian Ministry of Education was authorized to acquire Microsoft Student Media software only for its faculty, staff and students, and was not authorized to transfer its license to others except under limited circumstances and only with Microsoft's written consent.

Under the Jordanian Ministry of Education Subscription Enrollment, which is part of the MOE Agreement, Educational Solution and Technological Development Inc. d/b/a Educational Solutions d/b/a EdSol ("EdSol") was authorized to distribute Student Media software to Jordanian Ministry of Education qualified educational users.     EdSol was a reseller entitled to sell the Student Media software to students under the Jordanian Ministry of Education Agreement. It was not authorized to distribute Microsoft Student Media software to users other than qualified educational users under the MOE Agreement. And, like other licensees of Microsoft Student Media software licensed for exclusive use and distribution abroad, EdSol was not authorized to import to the United

---

and pursuant to that order and agreement, Big Boy again shipped thousands of units of Student Media software to J.P. Logistics in Las Vegas Nevada.

4

States Microsoft software licensed for distribution outside the United States.

On April 2, 2007, Microsoft filed this lawsuit charging Big Boy with copyright infringement in violation of 17 U.S.C. § 501 *et seq* (Count 1) and infringing importation of copyrighted works in violation of 17 U. S.C. §602(a) (Count 2).

Microsoft now seeks partial summary judgment establishing Big Boys' liability on these claims. Big Boy, in turn, cross moves for summary judgment on liability contending that both infringement claims are barred under the first sale doctrine, codified at 17 U.S.C. § 109(a).

## II. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ . P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v Catrett* , 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the burden of identifying those portions of the pleadings, depositions and other evidence on file which it believes demonstrates the absence of a genuine issue of material fact. If it satisfies this test, the burden then shifts to the non-moving party to make a sufficient showing on all essential elements of his claim with respect to which it bears the burden of proof at trial. *Id* at 322-23, 106 S. Ct. 2548.

To avoid summary judgment, the non-moving party must bring forth material facts, i.e. "facts that might affect the outcome of the suit under the governing law," *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986), and "must do more than simply show that there

5

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986).

In resolving a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S. Ct. 2419, 2434-35, 115 L.Ed.2d 447 (1991). Viewing the evidence in this light, the court must then decide if a rational or reasonable jury might return a verdict in favor of the non-moving party based on that evidence. Where the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party, there is no 'genuine issue for trial" and summary judgment is appropriately entered against the non-movant. *Matsushita,* 475 U.S. at 587, 106 S. Ct. 1348.

### III. Discussion

Under § 106(3) of the Copyright Act, a copyright owner "has the exclusive rights...to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. §106(3).

A cause of action for infringement of this right is established under section 501(a) of the Act,[2] which provides:

> Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in 106(a) or who imports copies of phonorecords into the United States in violation of Section 602, is an infringer of the copyright or right of the author, as the case may be.

--------

[2] To establish a claim for copyright infringement under §501, Microsoft must show that (1) it owns valid copyrights in the works at issue, and (2) the Big Boy defendants encroached upon Microsoft's exclusive rights under the Copyright Act. *Feist Publications, Inc v Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S. Ct. 1282 (1991); *Entertainment Research Group, Inc. v Genesis Creative Group, Inc.,* 122 F.3d 1211, 1217 (9th Cir. 1997).

A cause of action for infringing importation of copyrighted works is further established under section 602(a) of the Act, which provides:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies ... of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies... under section 106, actionable under section 501.

A copyright owner's exclusive right to distribution established by §106(3) is limited by § 109(a), which provides:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord....

This last section codifies the so-called "first sale doctrine," which holds that once a copyright owner consents to the sale of particular copy of his work, he may not thereafter interfere with subsequent sales or distribution of that particular copy. *Parfums Givenchy, Inc. v Drug Emporium, Inc.*, 38 F.3d 477, 480 (9th Cir. 1994).

Microsoft concedes that §109(a) generally limits §§106(3) and 602(a), but contends that §109(a) does not apply in this case because, although the Student Media software at issue was copyrighted in the United States, the software was manufactured and first distributed overseas. Microsoft contends that the software in question was not "lawfully made under [Title 17]" in these circumstances.

In *Quality King Distributors, Inc. v L'Anza Research Int'l, Inc.*, 523 U.S. 135, 138, 154, 118, S. Ct. 1125, 140 L.Ed.2d 254 (1998), the Supreme Court recognized that the right granted by §602(a) is limited by "the first sale" doctrine codified at §109(a), which it found applicable to

7

imported copies of copyrighted works. However, *Quality King* involved "round trip" importation: a product with a U.S. copyrighted label was manufactured inside the United States, exported to an authorized foreign distributor, sold to unidentified third parties overseas, shipped back into the United States without the copyright owner's permission, and then sold in California by unauthorized retailers. 523 U.S. at 138-39. The Court held that § 109(a) can provide a defense to an action under § 602(a) in this context. *Id* at 144-52.

However, because the facts involved only domestically manufactured copies, the Court did not address the effect of § 109(a) on claims involving unauthorized importation of copies made abroad. *Id.* at 154 (Ginsburg, J., concurring)("[W]e do not today resolve cases in which the allegedly infringing imports were manufactured abroad.") . Moreover, the Court did not discuss the scope of § 109(a) or define the meaning of "lawfully made under this title."

## A. Copyright Infringement [§§ 106(3), 501]

Microsoft alleges that Big Boy directly and indirectly imported into the United States vast quantities of Microsoft Student Media software that was manufactured in Ireland and licensed for use outside of the United States, without approval or authorization from Microsoft, and that it thereafter distributed that product to unqualified end users in the United States without the approval or authorization from Microsoft. On this predicate, it charges Big Boy with copyright infringement under Section 501.

The evidence which it presents in support of its motion for summary judgment on this claim demonstrates, without contradiction, that Big Boy arranged to import (on behalf of eDirect) approximately 10,000 units of Student Media software from Edsol and Mahmoud Shadid in Jordan, and that this software was manufactured in Ireland and initially distributed to EdSol in

8

Jordan pursuant to a licensing  agreement between Microsoft and the Jordanian Ministry of Education ("Jordanian MOE Agreement").

Big Boy asserts the first sale doctrine as a defense to this  claim.   To prevail  under this defense, Big Boy  must establish that "title to the copy passed through a first sale by the copyright holder." *Novell Inc.  Unicom Sales, Inc*. 2004 WL 1839117, *8 (N.D. Cal. 2004).  Big Boy attempts to show this here  by arguing  that Microsoft's  initial distribution of the product to EdSol in Jordan was in fact a  "sale," that it lawfully took title of the product from EdSol by sale,  and  that  it  was thereafter  free to redistribute the product in  the United States.

Microsoft counters  that the first sale doctrine has no threshold  application  because its software was  distributed by license, not "sale," to EdSol through a licensing agreement between Microsoft and  the Jordanian Ministry of Education. *See e.g Wall Data Inc.  v  Los Angeles County Sheriff's Dept*., 447 F.3d 769, 785 n. 9  (9th Cir. 2006)(noting that "first sale doctrine rarely applies in the software world because software is rarely 'sold'").  However, the court need not resolve this issue here because, as more  particularly  discussed   below, it finds section  109(a)   facially inapplicable to a foreign manufactured product.

Big Boy  asserts that it obtained   copies of software which  were "lawfully  made" (manufactured in  Ireland at Microsoft's direction) from  Edsol ( as  "first purchaser"),  leaving Big Boy  free to dispose of those copies however it sees fit under the first sale doctrine.  However, section 109(a) provides a defense to copyright  claims only where  the claims involve domestically made copies of U.S. copyrighted works. *Omega S.A.  v  Costco  Wholesale Corp*., 541  F. 3d 982, (9th Cir. September 3, 2008).  Put another  way,  the "first sale" doctrine" is no bar to a copyright claim where the copyrighted software is manufactured and first sold abroad. *See  Summit Technology*

*Inc v High-Line Medical Instruments Co.*, 922 F. Supp. 299, 312 (C.D. Cal. 1996); *Columbia Broadcasting System, Inc. v Scorpio Music Distributors, Inc.*, 569 F. Supp. 47, 49-50 (E.D. Pa. 1983), *aff'd,* 738 F.2d 421 (3d Cir. 1984).[3]

The rationale here is that the first sale doctrine protects only resales of works lawfully made "under this title," a phrase which is generally interpreted to mean works legally made *in the United States.* That is, the first sale doctrine has no application to copyrighted works manufactured abroad because such works are not made "under this title." *See Parfums Givenchy, Inc. v Drug Emporium, Inc.*, 38 F.3d 477, 481-92 (9th Cir. 1993); *Swatch SA v New City, Inc.*, 454 F. Supp.2d 1245 (S. D. Fla. 2006)(Huck, J.)(because Swatch watches were manufactured and first sold abroad, defendant's importation of watches violated Swatch's right to prevent importation under § 602(a)); *UMG Recordings, Inc. v Norwalk Distribution, Inc.*, 2003 WL 22722410 **3-4 (C.D. Cal. 2003); *Lingo Corp v Topix, Inc.*, 2003 WL 223454 *4 (S. D. N. Y. 2003); *T. B. Harms Co. v. Jem Records, Inc.,* 655 F. Supp. 1575 (D. N. J. 1987).

---

[3]

With this limitation on scope of the"first sale" doctrine, Section 602(a) continues to provide protection for copyright owners in the "gray market," where a domestic copyright owner's copies intended for domestic sale are placed in competition with identical copies manufactured abroad. *Summit Technology*, 922 F. Supp. at 312; 2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright, §* 8.12[B][6][2006](Copyright Act "should still be interpreted to bar the importation of gray market goods that have been manufactured abroad").

Thus, under §602(a), if a United States copyright holder licenses other entities to manufacture and sell copies of its copyrighted works outside the United States, that copyright owner can prevent those foreign manufactured and purchased works from being sold and competing in the domestic marketplace. *See e.g. Columbia Broadcasting Systems v Scorpio Music Distribs, Inc.,* 569 F. Supp. 47, 49-50 (E. D. Pa. 1983), *aff'd without opinion,* 738 F.2d 424 (3d Cir. 1984) *Parfums Givenchy Inc v Drug Emporium, Inc.* 38 F.3d 477, 481-82 (9th Cir. 1994); *Swatch S.A. v New City, Inc.*, 454 F. Supp. 2d 1245 (S.D. Fla. 2006); *UMG Recordings, Inc. v Norwalk Distribs, Inc.*, 2003 WL 22722410 at **3-4 (C.D. Cal. 2003)(rejecting first sale defense to 602(a) claim for works manufactured abroad).

Here, it is undisputed that the Microsoft Student Media imported by Big Boy was manufactured in Ireland, and there is no evidence that this product was ever voluntarily sold by Microsoft in the United States. Therefore, even if the first sale defense were applicable to software that is licensed and not "sold," Big Boy is not entitled to raise this defense here. *See Denbicare U.S.A. Inc. v Toys "R" Us, Inc.*, 84 F.3d 1143, 1145-46 (9th Cir. 1996).

Without insulation from the first sale doctrine, Big Boy is subject to the same restrictions imposed by the Jordanian MOE Agreement under which the product was initially distributed to the Jordanian Ministry of Education and EdSol, its authorized reseller. *Microsoft Corp. v Harmony Computers & Electronics, Inc.,* 846 F. Supp. 208, 213 (E. D. N.Y. 1994)("To the extent that defendants bought their Microsoft Products from authorized Microsfot licensees, they were subject to the same licensing restrictions under which those licensees operated."). That is, Big Boy cannot obtain rights beyond those granted to EdSol:

> [E]ven an unwitting purchaser who buys a copy in the secondary market can be held liable for infringement if the copy was not the subject of a first sale by the copyright holder. *See American Int'l Pictures, Inc v Foreman*, 576 F.2d 661, 664 (5th Cir. 1978). Thus unless title to the copy passes through a first sale by the copyright holder, subsequent sales do not confer good title.

*Novell, Inc. v Unicom Sales Inc.* 2004 WL 1839117 at *13(N.D. Cal. 2004); *Major League Baseball Promotion v Colour-Tex*, 729 F. Supp. 1035, 1041-42 (D. N.J. 1990).

Where, as here, Big Boy acquired and admittedly distributed this Microsoft Student Media software to non-educational end users in the United States without authorization from Microsoft, it manifestly acted outside the scope of Microsoft's license and in violation of Microsoft's exclusive right to distribute under §106(3).

### 1. Enforcement of MOE Agreement Against Big Boy

Big Boy seeks to avoid liability by suggesting that the restrictions imposed under the MOE Agreement do not apply to it because the Jordanian Ministry of Education did not sign the MOE Agreement. From here, it argues that the Educational Reseller designated under the MOE Agreement - defendant EdSol and its principal Mahmoud Shadid - was free to dispose of the Microsfot Student Media it obtained under the Agreement in any way it pleased, and that Big Boy, as a subsequent purchaser of the software from Shadid, is equally free to dispose of the software in any manner it sees fit.

However, it is undisputed that both the Jordanian Ministry of Education and Microsoft signed a June 6, 2006 Amendment to the MOE Agreement, captioned "Campus and School Agreement and School Subscription Enrollment Amendment" [DE# 166-9]["Amendment"]. This document explicitly and repeatedly refers to the underlying MOE Agreement and School Subscription Enrollment Agreement. [For example, the MOE Agreement Number (6999602) is listed on the MOE Agreement Amendment, and the Amendment repeatedly refers to the identified "Campus and School Agreement."]

Further, this document explicitly reaffirms and incorporates the underlying MOE Agreement through the following averment which appears just before the parties' signature line:

> Except for changes made by this amendment, all terms of the agreement and the subscription enrollment remain unchanged. By signing below the parties agree to be bound by the terms of this amendment.

The Jordanian Ministry of Education's signature on this Amendment which expressly acknowledges the force of the underlying MOE Agreement evinces the parties' clear intent to be bound by the terms of the MOE Agreement as well as the Amendment.

That the parties intended to be mutually bound by the MOE is further evinced by their subsequent course of conduct, where multiple communications generated by Microsoft emphasized that EdSol's acquisition and distribution of the Student Media software was pursuant to the terms of the MOE Agreement. For example, a June 7, 2006 letter from Mr. Gebrane of Microsoft to Mahmoud Shadid describes the pricing for the software, and the licenses required to use it, stating that the prices are "in reference to the Microsoft academic agreement signed between the Ministry of Education in Jordan, Edsol and Microsfot" [DE# 166-14]. The "academic agreement" referenced is the MOE Agreement. Further, on this same date Mr. Gebrane sent a letter to EdSol stating that Edsol is authorized "to sell Microsoft licenses ... to academic institutions, " and on June 8, 2006, Gebrane sent another letter to Shadid stating the EdSol was authorized to distribute certain Student Media "to the Student PC's under the Ministry of Education of Jordan Agreement." [DE# 166-14]. This confirming letter further states that EdsSol's distribution of Student Media must be "per the terms and conditions of the Agreement."

Shadid and EdSol likewise acted in recognition of the obligations created by the underlying MOE Agreement. On June 20, 2006, for example, Shadid sent an email to Farah Distribution, Microsoft's distributor in Jordan, ordering a number of units of Microsfot Student Media software [DE# 166-17]. In this email, Shadid specifically refers to the "MOE contract" and lists the Microsoft Subscription Enrollment Number (8779602) applicable to it. [DE# 166-4]. This email also includes a purchase order that references the "MOE ...license" and lists the Subscription Enrollment number. Further, On August 7, 2006, EdSol placed an order for additional Microsoft Student media through a purchase order which specifically refers to "Contract 8779602" (the subscription enrollment number applicable to the MOE Agreement).

13

This course of conduct -- viewed in conjunction  with the signed Amendment which explicitly refers to the underlying MOE license agreement and reaffirms parties' intent to be bound by its terms -- plainly evinces that the  MOE Agreement was part of the Agreement between the Jordanian Ministry of Education and Microsoft,  and that both parties were bound by its terms.

A document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms. *Standard Bent Glass Corp v Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003); *PaineWebber, Inc. v  Bybyk*, 81 F.3d 1193, 1201 (2d  Cir. 1996); *Hertz Corp v Zurich American Insurance Co.*, 496  F. Supp. 2d 668, 675 (E.D. Va. 2007); *Kantner v Boutin,* 624 So.2d 779, 781 (Fla. 4th DCA 1993); *Temple Emanu-El of Greater Fort Lauderdale v Termarco Industries , Inc.*, 705 So.2d 983 (Fla 4th DCA 1998); *Hurwitz v C.G.J. Corp.,* 168 So.2d 84, 87  (Fla. 3d DCA 1964)("A document must be considered incorporated by reference where the incorporating document specifically provides that it is subject to the incorporated document." )

As numerous courts have acknowledged, however, a  requirement that  the contract language be explicit or otherwise clear and precise does not amount to a rule that the parties must use a rote phrase or some other "magic words" in order to effect an incorporation by reference. *See e.g. Quix Snaxx, Inc. v Sorensen,* 710 So.2d 152, 154 (Fla. 3d DCA 1998). Rather, it is sufficient if the general language of the incorporation clause reveals an intent to be bound by the terms of the collateral document. *Sharpe v Lytal & Reiter, Clark, Sharpe, Roca, Fountain, Williams,*  702 So.2d 622, 623 (Fla. 4th DCA 1997).

In this case, the Amendment includes more than a mere reference to the MOE Agreement . It contains language that specifically expresses the parties' intent to be bound by that Agreement

14

("Except for changes made by this Amendment, all terms of the agreement and the subscription enrollment remain unchanged."). This language shows that both parties intended that the MOE agreement and all its provisions were part of the licensing agreement between the parties. The language is unequivocal and specific enough to describe and incorporate in full the underlying MOE Agreement.

Thus, the MOE Agreement is enforceable as between Microsoft and the Jordanian Ministry of Education, as well as its designated educational reseller (EdSol and Mahmoud Shadid), and the restrictions imposed under the MOE Agreement are likewise enforceable against Big Boy, which imported the product directly and indirectly through a distribution from Shadid. *See e.g. Salco Distributors, LLC v iCode, Inc.*, 2006 WL 449156 (M.D. Fla. 2006); *Management Computer Controls, Inc. v Charles Perry Construction, Inc.,* 743 So.2d 627, 631 (Fla. 1st DCA 1999)(software license agreement was incorporated into sales contract where sales contract was executed on order form that referred to license agreement and plainly stated parties' intent to be bound by its terms, and buyer agreed to terms of license agreement by breaking seal on software).

### B. Infringing Importation [§602(a)]

Microsoft also seeks summary judgment on its infringing importation claim, 17 U.S.C. §602(a).[4] On this claim, Microsoft presents undisputed evidence that the Student Media software

---

[4]As noted above, Section 602(a) provides:

Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside of the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

Infringing importation under 602(a) is merely a subcategory of "infringement of the exclusive right to distribute copies...under section 106," so conduct that does not violate 106(3) cannot

admittedly imported into the United States by Big Boy directly from Mahmoud Shadid in Jordan and indirectly from eDirect was manufactured in Ireland and licensed for use by students outside of the United States. It also demonstrates that Big Boy was not authorized to import or distribute this software in the United States.

Big Boy again asserts the first sale doctrine in defense of the § 602(a) infringement claim. However, as discussed above, this defense is applicable only to products which are manufactured *within* the United States, *see Omega*, 541 F.3d 982, and cases cited *supra*, and hence has no application to the situation at bar.

Finally, the fact that Big Boy acquired some of the product indirectly by purchase from eDirect in Canada is of no moment, because "the purchaser of illegally imported copies has no more authority to distribute copies than does the original importer." *Parfums Givenchy Inc v Drug Emporium Inc*. 38 F.3d 477, 482 (9th Cir. 1994).

### 1. Big Boy Authorization to Import Microsoft Student Media Software

Big Boy attempts to create an issue of fact on the question of whether Microsoft authorized its importation of Microsoft Student Media into the United States by reference to certain communications between Mr. Gebrane, of Microsoft, and Mr. Shadid, of EdSol. The record does reflect that Mr. Shadid raised the possibility of shipping software to the United States with Mr. Gebrane, but the record is equally clear that neither Gebrane nor any one else at Microsoft ever authorized this movement.

_____

constitute infringement under §602(a). Also, because conduct covered by §109(a) does not violate § 106(a), conduct covered by §109(a) does not violate §602(a). *Omega v Costco Wholesale Corp.,* 541 F.3d 982 (9th Cir. 2008).

16

To the contrary, Gebrane told Shadid to refrain from shipping the software until he obtained Microsoft approval. Further, when Shadid wrote to Gebrane stating he planned to export a certain quantity of Student Media Software to the Untied States, Shadid specifically indicated that he intended to have it loaded onto PCs for "return[] back to Jordan to be used in our student initiative so as to be sold to students." [DE# 166-20].

Both parties seem to question the sincerity of Shadid's plan to reroute the software product back to Jordan through this cumbersome maneuver [Blackburn Dep. at 211:22-25, 214:8-17], but this is of little moment to the resolution of authorization question because there is no evidence reasonably susceptible to interpretation that Microsoft authorized Shadid's importation plan. Gebrane's response to Shadid's proposal was to emphasize that the software had to be used "for the students ] of Jordan, under the umbrella agreement with the Ministry of Education in Jordan," and this caveat was delivered with the explicit direction, "Do not ship until I get you an approval." [DE# 166-20] [Gebrane Dep. At 124: 24-25].

As Big Boy has not raised any genuine issue of act on question of whether Microsoft Student Media software in question was ever sold in the United States by the copyright owner, or imported to the United States with its authority, Microsoft is entitled to summary judgment on the §602(a) claim for infringing importation of copyrighted works. *See e.g. Denbicare*, supra, 84 F.3d at 1150.

### C. Permanent Injunction

Microsoft argues that it is entitled to a permanent injunction preventing Big Boy from any future infringement of Microsoft's copyrights because liability is established and there is a threat of continuing infringement. *Olan Mills, Inc. v Linn Photo Co.,* 23 F.3d 1345 (8th Cir. 1994); *Walt*

17

*Disney Co v Powell*, 897  F.2d 565, 567-68 (D.C. Cir. 1990).  In support of this request, it emphasizes that Big Boy continued dealing in infringing Microsoft software despite plain warnings on the software that its distribution of it violated Microsoft 's rights, and  that  Mr. Blackburn was well aware of these  licensing restrictions which he  discussed  with other participants in the importation scheme.

A court may order permanent injunction  "to prevent or  restrain infringement of [the owner's] copyright." 17 U.S.C. §502.  Generally, a showing of copyright infringement liability and threat of  future violations is sufficient to warrant entry of a permanent injunction.  *MAI Systems Corp v Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993).  In this case, the Court finds there is a substantial threat of ongoing infringement given the history of related  litigation involving these parties, and "the magnitude of defendants' infringing activities  and  the relative ease with which such infringement can be perpetrated."*Columbia Pictures Industries, Inc. v T & F Enterprises, Inc.*, 68 F. Supp. 2d 833, 841 (E.D. Mich. 1999).  A judgment of permanent injunction upon these claims shall according enter by separate order of the court.

## IV. Big Boy Counterclaims

### A. Tortious Interference

The Big Boy defendants claim that Microsoft's investigative techniques during the eDirect litigation  and Microsoft's subsequent copyright infringement lawsuit against them  constitutes tortious interference with advantageous business relationships  because Microsoft's litigation action has disrupted Big Boys' business.

18

Because the court has found that Big Boy liable for copyright infringement in violation of 17 U.S.C. § 501, and infringing importation of copyrighted works in violation of 17 U.S.C. § 602, it finds no material facts in dispute regarding Big Boys' counterclaim for tortious interference.

While Microsoft's effort to stop Big Boys' importation and distribution of infringing Microsoft products was plainly intentional, it was also justified in light of the infringing nature of the software and the eDirect Court's impoundment orders. Big Boy is accordingly unable to adduce any evidence supporting the "unjustified interference" element of this claim, upon which summary judgment is appropriately entered in favor of Microsoft. *See generally KMS Restaurant Corp v Wendy's Int'l Inc*. 194 Fed. Appx. 591, 603 (11th Cir. 2006); *Ethan Allen, Inc. v Georgetown Manor, Inc*., 647 So.2d 812 (Fla. 1994).

Additionally, the court agrees that Big Boys' tortious interference claim is barred by Florida's litigation privilege to the extent this claim is predicated on Microsoft's conduct in pursuing its legal remedies through this lawsuit and another lawsuit filed against eDirect, one of Big Boys' customers/ suppliers, for related activities. *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v United States Fire Ins. Co.* 639 So.2d 606, 608 (Fla. 1994);

### B. Civil Conspiracy Counterclaim

Big Boy also asserts a claim for civil conspiracy against Microsfot based on alleged illegal acts conducted by Microsoft investigators during course of their investigation, and specifically, based on the investigators' alleged threat to imprison Mr. Blackburn if he did not cooperate with Microsoft.

The elements of civil conspiracy under Florida law consist of (1) a conspiracy between two or more parties; (2) to do an unlawful act, or to do a lawful act by unlawful means; (3) an overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result. *Fla. Fern Growers Ass'n Inc. v Concerned Citizens of Putnam County*, 616 So.2d 562, 565 (Fla. 5th DCA 1993).

With respect to the first requirement, it is generally recognized that a corporation can only act through its agents and representatives. Thus, under the intracorporate conspiracy doctrine, a corporation's officers, directors or employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation. *Dickerson v Alachua County Com'n,* 200 F.3d 761 (11th Cir. 2000). The rationale underpinning this theory is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself. *Id* at 767.

An exception to this requirements exists where the officer, director or employee of the corporation has a personal stake in the illegal activities separate and distinct from that of the corporation. *Jewel Foliage Co. v Uniflora Overseas Florida, Inc.,* 497 F. Supp 513, 518 (M.D. Fla. 1980). In this case, Big Boy attempts to trigger this exception with the allegation that "[u]opn information and belief, [Microsoft's] investigators were not employees of Microsoft, and/or had a personal financial stake in the outcome of the investigation separate and distinct form the interests of Microsoft." [Amended Counterclaim ¶32].

In support of its motion for summary judgment on this counterclaim, Microsoft offers the declarations of the investigators at issue. Each avers that he was employed by Microsoft at the time of the investigation of Big Boy, acted under the auspices of Microsoft, and had no personal interest in the investigation - financial or otherwise – other than that of his employer. In addition, each avers

20

that he has received and will receive no compensation in connection with his investigatory work other than his normal salary.

While there is a disputed issue of fact on whether they ever threatened Blackburn with imprisonment, as he alleges, even if the court assumes that this allegation is true for summary judgment purposes, it does not raise a material issue of fact on the question of whether Microsoft investigators were acting outside the scope of their employment.

The concept of acting "within the scope of employment " in the context of a conspiracy allegation assists courts in distinguishing "between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place." *Johnson v Hills & Dales General Hospital,* 40 F.3d 837, 840 (6th Cir. 1994), *cert. den.*, 514 U.S. 1066, 115 S. Ct. 1698, 131 L.Ed.2d 560 (1995).

The mere fact that an activity is illegal or inappropriate does not, without more, render that activity outside the scope of employment. *McIntyre ex rel. Estate of McIntyre v United States*, 545 F.3d 27 (1st Cir. 2008)("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."); *Hayes v Allstate Ins. Co.,* 95 F. Supp. 2d 832 (W.D. Tenn. 2000); *Lindsey v Allstate Ins. Co.*, 34 F. Supp. 2d 636 (W.D. Tenn. 1999).[5]

---

[5]

The Restatement lists a number of factors to consider in determining whether unauthorized conduct is sufficiently similar or incidental to authorized conduct to be within the scope of employment, including whether the employer "has reason to expect that such an act will be done," "the similarity in quality of the act done to the act authorized," "the extent of departure from the normal method of accomplishing an unauthorized result," and "whether or not the act is seriously criminal." Restatement (Second) of Agency, §229 (2)(f)(g)(i)(j). As with forbidden acts, criminal acts are not automatically outside the scope of employment. Restatement (Second) of Agency § 231.

To show that Microsoft investigators acted outside the scope of their employment, Big Boy must show that they acted "in their personal interests, wholly and separately from the corporation" *Bhatia v Yale University*, 2007 WL 2904205 (D. Conn. 2007), citing *Tardd v Brookhaven National Lab.*, 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006). While at some point, unauthorized conduct may cross the line between acts falling within the scope of employment and those that are so far removed from the employer's methods and purposes that they fall outside it, *McIntyre, supra* , in this case Big Boy has not alleged any facts pertaining to the investigative techniques that would potentially trigger this exception. Because it  fails  to adduce evidence sufficient  to create a genuine issue of material fact on whether the investigators acted outside scope of employment, separate and part from their duties to investigate suspected software piracy, the court finds Microsoft entitled to entry of summary judgment on this counterclaim. *Crews v County of Nassau*, 2007 WL 4591325 *12 (E. D. N. Y. 2007).

Further, Big Boys' allegations pertaining to actions of "foreign divisions" of Microsoft  are insufficient to evade application of the  intracorporate conspiracy doctrine. *Copperweld Corp v Independence Tube Corp*, 467 U.S. 752, 777 (1984)(corporation and wholly owned subsidiary are incapable of conspiring with each other for purpose of Sherman Act violation); *Bryant  Heating and Air Conditioning Corp. v Carrier Corp*, 597 F. Supp. 1045 (S.D. Fla. 1984)(manufacturer, wholly owned subsidiary, and individual officers and/or personnel did not constitute requisite combination of a separate economic group necessary to establish Florida tort of conspiracy).

As the only evidence proffered by  Big Boy in support of its civil conspiracy claim involves actions of Microsoft investigators within  the scope of their employment, and the "personal interest" exception is  disproved by the only evidence on record, Big Boy's  civil conspiracy claim is

22

necessary foreclosed by application of the  intracorporate conspiracy doctrine.  Microsoft is accordingly entitled to entry of summary judgment upon this counterclaim.

### 3. Defamation

Big Boy alleges that the press release Microsoft issued on April 3, 2007 in connection with the filing of this and other copyright infringement lawsuits contained two misstatements:
(1) "Microsoft Corp announced efforts to shut down alleged " international smuggling operations," and (2) "To those who say software piracy is a victimless crime, I would say this case tells a different story."

Specifically, Big Boy finds the  references to "piracy" and "smuggling" objectionable.

In light of the court's finding of Big Boys' liability for copyright infringement and infringing importation,  Big Boy is unable to raise a genuine issue of material fact regarding the falsity of the statements in question.   That is, the accuracy of the words "piracy" and "smuggling" as descriptors of Big Boys' conduct is not reasonably susceptible to debate in light of the liability findings.

"Piracy" is defined as "[t]he unauthorized  and illegal reproduction or distribution of materials protected by copyright, patent or trademark law." Black's  Law Dictionary (8th ed. 2004). Thus, "piracy" is not necessarily limited  to copying of copyrighted works,  but includes unauthorized distribution or use of copyrighted works as well.  See Merriam Webster's Online Dictionary,  Piracy,  http://www.merriam-webster.com/dictionary/piracy;  Merriam  Webster's Dictionary of Law, http://dictionary.reference.com/brose/piracy. ("piracy," [2.a]: "the unauthorized copying, distribution or use of another's production ...esp. in infringement of a copyright. Example: software piracy").

23

Further, "smuggling" is defined as "[t]he crime of importing or exporting illegal articles or articles on which duties have not been paid." Blacks Law Dictionary (8th ed. 2004). Microsoft's press release does not state the software at issue was copied, but rather states that it was diverted from special educational programs and illegally brought into the United States.

When the totality of the publication is considered the dictionary definitions of "piracy" and "smuggling" are sufficiently broad to encompass the activities charged in Microsoft's complaint. As there is no genuine issue of fact on the truthfulness of these terms as applied to the conduct alleged and proved in support of Microsoft's infringing importation claim, Big Boy is unable to come forward with evidence on an essential element of its claim and necessarily suffers adverse summary judgment upon it.

## VI. Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. Microsoft's motion for partial summary judgment on Big Boys' liability for copyright infringement and infringing importation [DE# 55] is **GRANTED;**

2. Big Boy's cross motion for summary judgment on liability under the first sale doctrine [DE# 57] is **DENIED.**

3. Microsoft's motion for summary judgment on the Big Boys' counterclaims [DE# 59] is **GRANTED.**

4. Pursuant to Rule 58, partial final summary judgment in favor of Microsfot in accordance with the foregoing shall enter by separate order of the court.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _1s_ day of ~~November~~, 2008.

Dec.

Daniel T. K. Hurley
United States District Judge

cc.  All counsel

25